JULIA A. McLAIN, Executrix, et al., v. M. V. B. PARKER, Appellant.

Division One, June 14, 1910.

1. **FRAUD AND DECEIT:** Misrepresentations. Where defendant, under the cloak of religion and friendship, in whom plaintiff had reposed confidence and trust due to years of business associations and his knowledge of mining properties, represented to plaintiff that certain mining properties in New Mexico could be bought for $12,000, and were cheap at that price, and if plaintiff would put up half he would the other half, and received $6000 from plaintiff and bought the properties for $2000, taking the title in his own and plaintiff's name and fails to account for the balance, plaintiff, who did not discover the fraud until after the mining properties had been disposed of, is entitled to a judgment for $6000 with interest.

2. ———: Agent: Exchange of Land. In an exchange of his principal's lands, an agent has no right to put in his own lands without his principal's knowledge; and proof of the agency and that the agent's land was exchanged for that of the principal without his knowledge, is sufficient to avoid the contract, and the damage in case of rescission is the purchase price and interest. However, in this case the evidence shows actual fraud—concealment and deception.

3. ———: Rescinding Contract: Damages: Status Quo. In a suit for fraud and deceit, plaintiff has the right to damages without rescinding the contract. But in this case, based on a purchase of land by defendant for himself and plaintiff for $200, but which he represented to plaintiff actually cost $2200, of which amount plaintiff put up one-half, plaintiff has taken the precaution to make a tender of such instruments as would place defendant *in statu quo.*

4. ————: **Limitations.** In matters of fraud and deceit, the Statute of Limitations does not begin to run until such time as the fraud is discovered. A defendant cannot purposely hide his fraud and deception for years, and studiously so act as to allay the suspicions of one who has reposed confidence and trust in him, and successfully plead the statute when sued for the amount he has fraudulently obtained.

5. ————: **Misrepresentations: Value of Property.** Representations as to what will be done in the future and as to the value of property to be purchased, though false, are not alone actionable; but where defendant, by his fraud and deceit, in reference to the price to be paid for the property, was the inducing cause of plaintiff's parting with his money, such false representations become actionable.

6. ————: **For Money Wrongfully Obtained: Action at Law.** One paying money by reason of the fraud and deceit of another is entitled to recover the amount so lost, together with legal interest. So that where the petition does not undertake to attack a contract between the vendor and vendee, but alleges that defendant represented to plaintiff that he knew where they could buy property cheap, that plaintiff put up his portion of the money represented to be necessary and defendant put up none; that by that false representation defendant, to whom were left all matters of purchase, induced plaintiff to part with far more money than was necessary to buy the property, and appropriated the balance to his own use, plaintiff is entitled to recover the amount so lost, with interest, and it is immaterial whether the action tried to the court be denominated a suit in equity or one at law.

Appeal from Jackson Circuit Court.—*Hon. John G. Park,* Judge.

AFFIRMED.

*E. P. Garnett* and *I. O. Pickering* for appellant.

(1) The petition does not state facts sufficient to constitute a cause of action. It is utterly impossible to undo what has been done. The defendant cannot be placed *in statu quo.* He only bought an undivided half interest. What power has any court to compel him to buy the other half interest? "The court clearly

has no power to compel the defendant to purchase the plaintiff's stock in the corporation." Constant v. Lehman, 52 Kan. 227; Norton v. Bohart, 105 Mo. 631; 24 Am. and Eng. Ency. Law, 622; King v. Wise, 43 Cal. 628; Pitts v. Weakley, 155 Mo. 134; Tesson v. Ins. Co., 40 Mo. 36. (2) The petition does not charge any actionable misrepresentations. It is well settled that representations as to what will be done in the future and representations as to the value of property, though false, are not actionable. This doctrine applies especially to mining claims which are purely speculative. No action will lie for the expression of any opinion concerning the prospective value of a mining claim, it matters not how fallacious it may prove. Brown v. Mining Co., 194 Mo. 681; Holbrook v. Conner, 60 Me. 578; Hemer v. Cooper, 8 Allen 334; Cooper v. Severing, 106 Mass. 79; Sowers v. Parker, 59 Kan. 12; Cornwall v. McFarland, 150 Mo. 379; Wade v. Ringo, 122 Mo. 326; Scroggins v. Wood, 87 Ia. 497; People v. Healey, 128 Ill. 9; Gossett v. Glazier, 165 Mass. 473; Myers v. Summerville, 85 Mo. App. 186; Harrison v. Waldon, 89 Mo. App. 164; Wilson v. Jackson, 167 Mo. 156; Bales v. Merrill, 173 Mo. 494. (3) This being a suit in equity, it should appear from affirmative allegations in the petition that the plaintiff had no plain, adequate and complete remedy at law. This not appearing, the objections to the introduction of any evidence should have been sustained. Benton County v. Morgan, 163 Mo. 678; Hayden v. Railroad, 117 Mo. App. 76; Humphreys v. Milling Co., 98 Mo. 552. (4) The petition plainly shows that if the plaintiff ever had any cause of action against the defendant at all, it was an action at law to recover the difference between what was paid for the mining claims, and what defendant represented the price to be. Assumpsit is maintainable at law, though of equitable character. Henderson v. Koenig, 192 Mo. 695; Winningham v. Fancher, 52 Mo. App. 458; Gossett v. Glazier, 165 Mass. 473; Arn v.

Arn, 81 Mo. App. 133; Hathaway v. Foy, 40 Mo. 540. If plaintiff really paid the defendant more money than was necessary to pay for his interest in the property, "the allegations in the petition that the overpayment was made by reason of the false and fraudulent representations of defendant, do not necessarily change the course of action from assumpsit for money had and received." Dobson v. Winner, 26 Mo. App. 329; 24 Am. and Eng. Ency. Law, 622. (5) A party defrauded has two remedies: one at law and one in equity. He cannot pursue both remedies at the same time. "He may rescind the contract, restore what he has received and recover back what he has paid, or he may affirm the contract and recover damages he has sustained by the fraud. He cannot, however, do both. It is as difficult a feat to maintain a cause of action for the consideration paid for the purchase, on the ground of rescission, and one for the fraud which induced it and for breach of contract of purchase itself, in the same action, as it is to ride at the same time two horses." Wilson v. Cattle Company, 73 Fed. 997; Smith v. Booles, 132 U. S. 125. (6) The petition shows on its face that any alleged cause of action of plaintiff is completely barred by the Statute of Limitations. In order to toll the statute plaintiff pleads that defendant concealed the fact of his fraud and deceit. He does not state in what way any fraud and deceit was concealed. Not only so, but he testifies positively that the only way defendant concealed from him that he did not pay $6000 for the mine himself was that "he has never reported to me about it," and he is positive that this is the only way defendant concealed the alleged fraud. This is not sufficient. There must be some affirmative act, some trick or device. Wood v. Carpenter, 101 U. S. 141; Buckner v. Colcate, 28 Miss. 434; Nudd v. Hamlin, 8 Allen 130; Shelby Co. v. Bragg, 135 Mo. 296; Railroad v. Bridges, 46 Am. Dec. 528; Burling v. Newlands, 39 Pac. 49;

Hyatt v. Wolf, 22 Mo. App. 197; Hunter v. Hunter, 50 Mo. 445; State ex rel. v. Stuart, 111 Mo. App. 478. (7) Before the transaction was finally closed the plaintiff fully investigated the mining proposition and discussed the values with other parties in the mining district. The defendant did nothing to prevent the fullest and freest investigation by plaintiff, and he cannot now claim that he relied on defendant's representations. Southern Development Co. v. Silva, 125 U. S. 259; Wilson v. Jackson, 167 Mo. 135; Cornwal v. Real Estate Co., 150 Mo. 383; Gordon v. Butler, 105 U. S. 556.

*W. R. Thurmond* for respondents.

(1) This entire suit and every count thereof is an equitable proceeding. The entire suit is for relief upon the ground of fraud and unconscionable advantage taken of the plaintiff by the defendant in pretending that the defendant was going in with the plaintiff as partner in the purchase of these various properties. Nelson v. Betts, 21 Mo. App. 219; Derby v. Donohoe, 208 Mo. 706; Railroad v. Brown, 43 Mo. 297. After having expressly waived a jury, having answered to the merits, having asked for a finding of fact, and tried throughout a case involving such a record as is here, on the theory that the suit is in equity, appellant's discovery of a lack of equitable jurisdiction comes rather late. Pomeroy v. Benton, 57 Mo. 550. (2) The petition charges actionable misrepresentations. 14 Am. and Eng. Ency. Law, 122, sec. 12 a, b and c; 20 Cyc. 34, sec. 3; Pomeroy v. Benton, 57 Mo. 531; Cahn v. Reid, 18 Mo. App. 116; Dunn v. White, 63 Mo. 181; 14 Am. and Eng. Ency. Law, p. 68, sec. 4, pp. 69, 70 and 71; Fall v. Hornbeck, 112 S. W. 41. (3) The Statute of Limitations does not run at all in favor of an agent, a partner, a trustee or any other person occupying fiduciary and confidential relations, so long as such relations exist and the other party has no reason

to doubt the good faith of his partner, agent, trustee or confidential friend. Nor does the statute run where the defendant "by absconding or concealing himself or by any other improper act prevents the commencement of an action." Shelby Co. v. Bragg, 135 Mo. 298; Bank v. Thayer, 184 Mo. 61; Prewitt v. Prewitt, 188 Mo. 675; Hoffman v. Perry, 23 Mo. App. 20; Foley v. Jones, 57 Mo. 64; Dillon v. Bates, 39 Mo. 301; 14 Am. and Eng. Ency. Law, pp. 129, 132; Dunn v. White, 63 Mo. 181; House v. Marshall, 18 Mo. 368; Cottrill v. Krum, 100 Mo. 397; Leicher v. Keeney, 98 Mo. App. 405; Bishop v. Seal, 87 Mo. App. 256; Derby v. Donahoe, 208 Mo. 684; Mires v. Summerville, 85 Mo. App. 187; Judd v. Walker, 114 Mo. App. 128.

GRAVES, J.—The record in this case covers about one thousand pages, and were it printed as records usually are, would cover about four times that space. Since the trial of the cause *nisi*, Carey McLain, the plaintiff, has departed this life, and is now here represented by an executrix, but for convenience we shall still speak of him as plaintiff, as was done *nisi*. The connection is better that way. The plaintiff and defendant were acquaintances of long standing—the one for years a farmer and stock raiser of Kansas, who by dint of hard work and good management had acquired much of this world's funds—the other, a lawyer, real estate and loan agent of the same State, who by business connections and otherwise had gained, to a degree, prominence and confidence in his sphere of action. Plaintiff, the farmer, was a Presbyterian by religious faith, and defendant, the lawyer, real estate and loan agent, as strongly Congregational in his beliefs and doctrines. Both, to the world, consistent members of the church. While we shall not undertake to quote from the Scriptures or other authorities in the statement of this case, but leave to those interested the task of getting together the proper phraseology and

authorship for the thoughts we express, yet the thoughts suggested by the record in this case carry us back to our boyhood recollections of the good old doctrines taught by the inspired in the Good Book. The gist of the case is fraud and deceit, the petition of eight counts asking for the rescission of as many distinct contracts on the ground of fraud and deceit in the concoction thereof. Blandly stated (although not in language quoted from an authority well known) the plaintiff charges that the defendant donned the livery of righteousness to serve the cause of Mammon, and by so doing entrapped, by his fraud and deceit, this plaintiff. For a time matters of pleading and proof may be commingled in the interest of brevity. In 1868, the plaintiff came to the State of Kansas. Later, he was domiciled in Kansas City, Missouri, and there resided until after the trial and perhaps until his subsequent death. Near the little town of Wellsville, Kansas, plaintiff lived, and on one corner of his farm stood a "Congregational" church house. Plaintiff, with Western generosity, helped maintain this church (though not of his identical faith) and to it at times came defendant to preach what he called "lay sermons." Defendant lived at Olathe, Kansas, not far from Wellsville, and for a while was in copartnership in the practice of the law with one John P. St. John, sometime Governor of Kansas and candidate of the Prohibition party for the high and honorable position of President of the United States. Plaintiff was interested much in the cause of prohibition—not as of the surface, but from the heart. So runs this record. Being thus interested, he had implicit faith in Mr. St John. Whether his confidences were fully justified, we doubt much from the disclosures of the record before us. Defendant and St. John, in addition to their ties arising from business association and like political and economical eye-glasses, were brothers-in-law. Not only so, but it would appear that after Mr. St. John had

resumed private life, yet having clustered around him the good wishes and confidences of those interested in the cause for which he stood and preached, he engaged in the alluring business of mining, with offices at Olathe, Kansas, and Chicago, and with New Mexico as his field for real action.

In at least some of his work in New Mexico, the defendant and St. John were jointly interested, and in one count of the petition before us, *between lines, and in the lines,* may be read the charge that they jointly conspired to deceive and defraud the plaintiff, having drawn to their aid a cousin of defendant, and perhaps a Swede, Otto Hansen by name.

The evidence upon the several counts of the petition must be taken together to properly comprehend the gravity of the offense charged against the defendant. Plaintiff claims, and we think properly, that all the transactions between plaintiff and defendant will have to be considered together, in order to see the real gist of the case. In general, the evidence shows that long before any of the transactions pleaded and proven, the plaintiff had much confidence in defendant growing out of their continued friendship, their relation of attorney and client, their other business associations, and the relationship of defendant to St. John, in whom plaintiff had implicit confidence as aforesaid, of which last fact the defendant evidently knew.

With these general statements, we take up the several counts of the petition, together with the proof thereon. Suffice it to now say that after well-worded pleadings in behalf of the defendant the cause was heard, and the trial court found for the plaintiff upon seven counts of the petition. In the other count, as in all, was a tender to return the property, and the defendant accepted the tender, and thus obviated a trial of the issues. Among the issues raised by answer is the Statute of Limitations. We shall note both the

pleadings and the proof on each count in separate paragraphs of the opinion.

I. We shall go more into detail upon the first count of the petition because it stands as the first alleged fraud between the parties.

By this count of the petition the plaintiff charges fraud in the purchase of some mining claims in New Mexico. Plaintiff alleges the different things which went to make up the ground work of his confidence in defendant. He alleges their business relations, their church relations, the brotherly manner in which defendant always addressed him as "Brother McLain," the fact that defendant was a lawyer and experienced not only in the law, but, as a real estate man, had dealt in mining claims and was familiar with the value thereof. He then charges that the defendant represented to plaintiff that he (defendant) knew where they (plaintiff and defendant) could get some good mining claims in New Mexico; that they would have to pay $12,000 therefor, and that the cost thereof would be $12,000; that such claims were valuable and exceedingly cheap at such price. The petition then avers that the cost of the said mining claims was only $2000, and that the defendant knew such fact, and falsely represented the matter to the plaintiff, by reason of which false representation the plaintiff parted with $6000 in money and property—$3000 in cash and 80 acres of land, worth $3000. The petition also charges that the plaintiff did not discover the fraud until about August, 1903. The suit was instituted shortly thereafter.

It conclusively appears that plaintiff did in fact put up $3000 in cash and 80 acres of land on the strength of what defendant represented to him. From the evidence it appears that these two claims were owned by one Otto Hansen, a Swede, then a resident of New Mexico, but who later returned to the old country, where his deposition was taken before a

United States consul for this trial. Defendant, evidently knowing the admiration of plaintiff for Mr. St. John, seems to have suggested at the outset of the deal that he and St. John were interested in property near these claims, and that St. John thought that the claims which were about to be purchased were of great value. This suggestion was let slip at the early talks between plaintiff and defendant concerning these mines. It was as a seed cast into fertile soil. It grew, and defendant evidently knew it would grow, and cast it for that purpose. On the representation that it would take $12,000 to buy the property from Hansen, plaintiff put up $3000 in cash and deeded to St. John 80 acres of land worth $3000. Defendant represented to plaintiff that he could put in some land or property, and later told him that he could deed the farm to St. John as St. John was going to take the farm and give the Swede, Hansen, some rent-bearing property in lieu thereof. One George W. Parker, a cousin of defendant, also appeared in the deal, ostensibly as the agent of defendant and plaintiff. That is, the defendant represented to plaintiff that George W. was using his best endeavors to procure the property for them and had been sent to New Mexico to close the deal for them. Defendant claimed that he was putting in property and cash to the amount of $6000. When the facts were finally brought to light by the testimony in the case, it appeared that plaintiff was out his six thousand dollars in cash and land; that St. John ostensibly had the 80 acres of land; that St. John also had a few lots in Olathe, Kansas, of uncertain value (estimated at $1400), made to him by defendant through Hansen; that Hansen got $2000 in cash for the deeds to the mines. Where defendant ever put in any cash in the deal does not appear, except from his testimony that he did so do. When, where and what amount in dollars and cents, he fails to recollect. The

mines were owned by Hansen, and he made the deeds to plaintiff and defendant. He says that all he ever got was $2000 in cash. This was $1000 less than plaintiff paid. It is true that defendant went through the form of deeding his Olathe lots to Hansen, and Hansen (whether knowingly or otherwise, the record is not quite clear) deeded them back to St. John, the brother-in-law, but the cash that the defendant ought to have paid on the basis of a bona fide deal, is unaccounted for in any reasonable manner. Claim is made that St. John had an option on the lots, and that he was pricing them at $12,000. If he was, it is evident he did not get that sum, for the vagueness of defendant's recollection precluded the proof. The story of the Swede, Hansen, that he only got $2000, is practically undenied. The trial court evidently reached the conclusion that the defendant, St. John, George W. Parker, and perhaps Otto Hansen, the Swede, conspired to deceive the plaintiff, and the circumstances in evidence justify such a conclusion. One can hardly read this record without concluding that the plaintiff was deceived as to the actual costs of these mines, and in the act defendant was the chief, but not the only, actor. It requires no stretch of imagination under the facts to conclude that defendant knew that Hansen was receiving no such sum of $12,000 for the property. Nor can it be said that the trial court ought to have drawn the conclusion that the property was being purchased of St. John at $12,000 and defendant was acting bona fide in that kind of a deal. Defendant had urged that St. John spoke favorably of the property, in order to impress plaintiff with the value thereof. He never at once, according to plaintiff, let it be known that St. John was interested in the sale. Even when the deed was to be made to St. John for the 80 acres of land, it was explained that arrangements had been made with Hansen, in order to get the trade through, to give him some rentable property in lieu of the farm.

The trial court made an elaborate finding of facts
upon this count. In short, such finding reads:

"On the first count of the petition the court finds
that on or about and prior to May 29, 1893, the plain-
tiff was a farmer and stock raiser residing in Franklin
county, Kansas; that defendant was at all the times
hereinafter mentioned, and for many years prior there-
to had been, an attorney-at-law located at Olathe, John-
son county, Kansas; that on or about May 29, 1893, or
prior thereto, defendant stated to plaintiff that defend-
ant could purchase certain mining claims known as the
Big Giant and the Little Giant Mining Claims, situated
in Socorro county, New Mexico; that said claims were
very valuable and exceedingly cheap at the price which
defendant could purchase them; and that the same
would be a good bargain at said price; and the defend-
ant then and there proposed to the plaintiff that plain-
tiff and defendant should go in together in the purchase
of said claims, each contributing an equal amount to
the purchase thereof, each to own an equal share there-
in. The defendant represented to plaintiff that said
mining claims would cost, and that defendant would be
required to pay therefor, the sum of $12,000, or $6000
for the respective interests of plaintiff and defendant;
that plaintiff was not accustomed to, nor familiar with
mining land, nor the value thereof; that plaintiff had
some ten or twelve years theretofore known defendant,
and defendant had always professed to be a warm,
personal friend of the plaintiff; that plaintiff and
defendant were members of the church, and that de-
fendant professed to be an earnest, sincere Christian;
that plaintiff placed implicit confidence in defendant's
integrity, honesty and loyalty to him, and that defend-
ant had for some years prior thereto invested moneys
of the plaintiff in real estate loans, and plaintiff had
trusted defendant in said matters, both with regard
to the form and character of the security; that by
reason of the defendant's being a lawyer and real

estate dealer, plaintiff reposed confidence in defendant's judgment and knowledge of mining property, and relying solely upon the representations made by the defendants in reference to said mining claims, plaintiff was induced to and did pay to the defendant the sum of $6000 as part of the said purchase price, which sum of money defendant then and there represented to plaintiff was necessary to secure plaintiff's half interest in said mining claim; that the defendant caused the deed to be executed by one Otto Hansen to the plaintiff and the defendant, as grantees; had represented to the plaintiff that he, defendant, had paid the sum of $6000 for a one-half interest in said claim.

"The court further finds that the statements of the defendant to the effect that said mining claims cost $12,000, and that they were worth $12,000, and that defendant had paid $6000 for his share thereof, were each and all of them false, and were falsely and fraudulently made with the purpose and intent to deceive and defraud the plaintiff, and plaintiff was induced by said statements and by his confidence in the defendant aforesaid, to pay for his interest in said mining claim said sum of $6000.

"The court further finds the fact to be that defendant only paid the sum of $2000 for said mining claim.

"The court further finds that defendant planned to cheat and defraud the plaintiff in and about the purchase of said mining claim; that pursuant to said unlawful and fraudulent scheme and conspiracy, defendant had arranged to secure a purchaser for said mining claim at and for the price and sum of $2000; that defendant caused said George W. Parker to go to New Mexico on or about May 29, 1893, with the ostensible purpose of negotiating with said Hansen to purchase said claim at and for the price of $12,000, whereas, defendant at said time had arranged to purchase said property at the actual sum of $2000; that said Par-

ker's mission to New Mexico was false, fraudulent and dishonest, and with the purpose and intent upon defendant's part to deceive and impose upon plaintiff and obtain from him an excessive price for said property.

"The court further finds plaintiff's contribution to the purchase of said property to be $3000 in cash and a farm in Franklin county, Kansas, taken at an agreed valuation of $3000; that said cash was actually paid by the plaintiff to the defendant, and that said farm was conveyed by plaintiff to said St. John, under the false and fraudulent and deceitful representations by the defendant to him that St. John was to convey rental property of equal value to Hansen, the seller of the mines, whereas, no conveyance of any property whatever from St. John to Hansen was contemplated by any of the parties thereto; and that by means of said trick, device and fraud, said St. John obtained title to said farm worth $3000 without giving any consideration therefor.

"The court further finds that defendant's only contribution to the purchase of said mining claims was property located in the town of Olathe, Johnson county, Kansas, of the value of about $1400; that said property was conveyed to said Hansen without consideration, and by said Hansen without consideration again conveyed to said St. John.

"The court further finds that defendant received part of said money and property, in amounts unknown.

"The court further finds that defendant has, during the times mentioned and ever since, concealed the facts of said fraud and deceit, and has always continued to represent to the plaintiff that said mining claims cost $12,000, and thereby prevented plaintiff from discovering the fraud perpetrated upon him as aforesaid; and that plaintiff did not discover such fraud and deceit, and did not discover the facts until

229 Sup—6

the month of August, 1903, and until within two years prior to the filing of plaintiff's petition.''

The case is one of fact rather than of law. The judgment on this count was for $10,620, evidently the $6000 with accumulated interest at six per cent.

The findings of the chancellor are well supported by the evidence, the details of which serve no useful purpose. What little property Parker put into the deal was immediately deeded back by Hansen to St. John and later it would appear that one of the lots ultimately got to George W. Parker.

The defendant's deposition was taken twice, and then he testified upon the trial. A reading of these several statements is sufficient to convict the defendant of the charge of fraud. The record clearly indicates that defendant knowingly, willfully, and fraudulently imposed upon the plaintiff under the cloak of friendship and religion and by such fraud and deceit induced the plaintiff to part with $6000 of his money and property. If defendant did not get the bulk of it ultimately, it was because he divided up with his distinguished brother-in-law and cousin, for their assistance in the nefarious deal. Such schemes as disclosed by this record deserve an adequate condemnation at the hands of a chancellor, and this was done by the chancellor, *nisi*.

Nor is there substance in the plea of the Statute of Limitations. When this whole record is considered, there is ample evidence therein to justify the finding of facts, made by the chancellor below, which takes the case out of the Statute of Limitations. The judgment on this count is affirmed.

II. The second count relates to a deal by which it is charged that defendant, whilst acting as plaintiff's agent to make an exchange of property, exchanged his own (Parker's) lands to plaintiff, and that the same were practically worthless and known so to be by the said Parker.

Prior to August, 1893, defendant had loaned some of the plaintiff's money on a house and lot in Olathe, Kansas. Later, through the advice of his agent, Parker, the plaintiff took a conveyance of the lot for his loan, and Parker represented to him that it ought to sell for $500. Parker was looking after the property in the way of repairs and collecting rents. Finally defendant suggested to plaintiff that he thought he could trade the property to some men in Olathe for 200 acres of land in Benton county, Missouri. Plaintiff left it to Parker to determine whether or not it would be a good trade for him, and if so to make it. In order to facilitate the trade, and as requested by Parker, the plaintiff executed a deed to his house and lot in Olathe to Parker. At the time Parker had a deed for 2700 acres of Benton county land, of which this 200 acres was a part. He claims, however, that he only held such deed as a mortgage to secure a loan made thereon in the sum of $1000. But even on that theory the evidence shows that prior to the trade with McLain, 1280 acres of this land had been deeded to defendant's daughter, May L. Parker, by defendant and wife, and that the daughter in fact held title for defendant. The two hundred acres conveyed to plaintiff was of this 1280 acres and was conveyed by defendant's daughter. For some time after the deal the plaintiff never saw the deed, and when he did see it and asked why the deed came from his daughter, the defendant was ready with a plausible explanation, which satisfied the plaintiff, and yet kept him in darkness as to having in fact gotten 200 acres of Parker's land. The trial court found that the Olathe property traded by defendant was of the value of $600; that defendant was plaintiff's agent to trade the same; that as such agent he had deeded to plaintiff 200 acres of his own land which was not worth over $200; that defendant had purposely kept from plaintiff's knowledge the real facts, and the fraud which had been per-

petrated upon him. On this count the court rendered judgment for $951.20, evidently the amount of the property, with interest thereon. The agency of Parker is unquestioned. The fact that he as McLain's agent, really palmed off upon his principal 200 acres of practically worthless land, belonging to himself, is well established by the proof. As McLain's agent, Parker had no right to put in his own property without McLain's knowledge and consent. Such fraud and deceit avoids the contract. The proof in this case shows actual fraudulent statements, but it need not have gone that far. Proof of the agency, and that without knowledge he had sold his own land to plaintiff, was sufficient. In such case, the contract can be avoided whether beneficial or not. Such contracts are avoided by public policy. The damage in the event of a rescission is the purchase price and interest. [Montgomery v. Hundley, 205 Mo. 138.]

The judgment upon this count is clearly within both the law and the evidence, and should be affirmed.

III. The second count of the petition just above discussed discloses a transaction somewhat out of the ordinary plan pursued by the defendant in dealing with the plaintiff. Defendant's general plan seemed to have been to maintain a brotherly feeling and then induce the plaintiff to join him in the purchase of different properties. He continually wrote letters of the most friendly spirit. They were addressed to "Dear Brother McLain," and closed with the affectation of "Your brother, M. V. B. Parker." One of lesser years and more practical business acumen ought to have read fraud between every line of many of these letters. It would seem that a dumb man might have grasped the idea that perhaps the assumed religious dodge was being overworked, but it appears old man McLain did not. It seems to have never dawned upon him that too much professed brotherly love in the

church was being administered to him in business transactions. In the third count of the petition occurs one of the usual modes employed by defendant to filch the pockets of "Brother McLain." That usual mode was for "Brother McLain" to be graciously, piously and reverently, taken into partnership, by "Your brother, M. V. B. Parker." We have the utmost respect for those who from the heart feel that they can and should address their friends and associates in the manner in which plaintiff was addressed; but we likewise have the deepest contempt for one who feigns such feelings for self-aggrandizement.

But we have somewhat digressed and will return to the third count. By appropriate pleading the plaintiff charged fraud and deceit in a certain contract wherein defendant had induced the plaintiff to join him in the purchase of some mineral land and other property. The facts of both pleading and proof are well stated in the trial court's finding of facts, which in material parts read:

"The court further finds the facts upon the third count as follows:

"That on and prior to October 20, 1899, plaintiff and defendant had been jointly interested in certain lands and business matters, and that on and prior to said date, defendant represented to plaintiff that defendant had discovered a very valuable mine of mineral land in Fulton county, Arkansas, consisting of eighty acres of land; that said land could be purchased cheap, and defendant proposed to plaintiff that plaintiff and defendant go in together in the purchase of said eighty acres of land, as well as in other deals and transactions, and that after much solicitation upon the part of defendant, plaintiff agreed with defendant that if defendant was convinced that said land was valuable for mining purposes, plaintiff would invest with the defendant in said land, and contribute an equal share of money with the defendant, and share

equally in said land when purchased; that thereafter defendant purchased said eighty acres of land and took a deed therefor in his own name, and afterwards conveyed to plaintiff a one-half interest in said land, and on or about said October 20, 1899, caused a contract to be drawn and executed by the parties to this action, setting out or purporting to set out their respective interests in said eighty acres of land, and in certain other deals and transactions, which said contract is in writing and is pleaded in full in the third count of plaintiff's petition.

"The court further finds that prior to the execution of said contract plaintiff had known defendant a long time, and that a relation of trust and confidence existed between them; that plaintiff placed confidence in defendant's judgment and knowledge of mining property and relied upon the representations made by the defendant, with reference to the value of said land, and relied upon defendant's statement in the contract aforesaid, that said eighty acres of land actually cost the sum of $2200, and relied upon defendant's statement as to the cost of the Huntsinger notes mentioned in said contract, whereby plaintiff was induced to and did sign and execute said contract and accepted said deed, and paid the defendant the sum of $1438.90 as plaintiff's due proportion of said eighty acres of land, and the other items and interest mentioned in said contract, together with plaintiff's expenses as set out therein. "And the court further finds that the statements made to plaintiff by defendant in parol, and by said written contract, with reference to the cost of said eighty acres of land in Fulton county, Arkansas, and as to the cost of the Huntsinger notes as mentioned in said contract, were false and fraudulent, and were made with the intent to deceive and defraud plaintiff and that plaintiff was induced thereby to pay to the defendant the sum of $1438.90.

"The court further finds that defendant in fact paid only $200 for said eighty acres of land, and not to exceed $340 for said Huntsinger notes."

The facts upon this count are voluminous but have been well summarized in the findings of fact above. There are disputes in the testimony, but we do not feel that the trial judge erred in his judgment as to which witness he should give credence. On this count the plaintiff had judgment for $1998.14, which was evidently $1438.90, the cash paid by plaintiff to the defendant, with interest. There is no denial of the fact that the defendant got the money, nor do we doubt that fraud and deceit tinctured this deal as in the preceding counts. Plaintiff whilst charging fraud and deceit in the petition, and having the right to sue for damages without rescinding the contract, has taken the precaution in this, as in other counts, to make a tender of such instruments as would place the defendant *in statu quo*. The record fully sustains the judgment on this count and it will be affirmed.

IV. We shall not go into great details upon the fourth count of the petition. It refers to eighty acres of land adjoining the one mentioned in the third count. The finding of fact made by the chancellor sufficiently states the case. The material portions read:

"The court further finds upon the fourth count as follows:

"That shortly after October 20, 1899, defendant represented to plaintiff that the eighty acres of land, adjoining the eighty acres of land mentioned in the contract set out in the first count of plaintiff's petition herein, could be purchased cheap, and proposed that plaintiff and defendant go in together and purchase said second eighty acres of land and contribute equally to the purchase thereof, and own said land in equal parts; that plaintiff expressed a willingness to go into said deal, and defendant thereupon pretended to enter

into negotiations for the purchase of said land, and wrote to plaintiff from time to time that defendant was endeavoring to purchase said land for their joint ownership as favorably as possible, and wrote to plaintiff that, after repeated negotiations, he had induced the owner of said land to reduce the price of said land to $380, and advised plaintiff that he and plaintiff purchase said land at said price, which plaintiff accordingly agreed to do, and paid to defendant $190 for plaintiff's share of the expenses of securing same; that defendant did procure a conveyance of said land from the owner thereof to plaintiff and defendant jointly, said land being described as follows:   The northwest quarter of the southwest quarter, and the southeast quarter of section 28, township 31, range 10, in Fulton county, Arkansas.

"The court further finds that at said time and prior and subsequent thereto, a relation of trust and confidence had existed between plaintiff and defendant; that plaintiff placed confidence in defendant's judgment and knowledge of mining and real property, and relied solely upon the representations made by defendant with reference to the value of said eighty acres of land, and with reference to what same would cost; that plaintiff was thereby induced to and did pay defendant $214; that defendant caused a deed to be executed by the owner of said land, one J. C. Worsham, to said land to defendant, and afterwards defendant conveyed one-half interest therein to plaintiff, representing that defendant had paid an equal sum of money for defendant's half interest in said land.

"The court further finds that the statements of defendant that he had paid $380 for said land, and that he had been negotiating with the owner thereof, endeavoring to secure a reduction of the price, and had finally succeeded in reducing the price to $380, and that the defendant had paid $190 for a one-half interest in said land, were each and all of them false,

and were falsely and fraudulently made with the purpose and intent of deceiving and defrauding plaintiff; and that said statements did deceive and defraud said plaintiff; and that plaintiff was induced thereby, by his confidence in defendant, to pay defendant said sum of $214.

"The court further finds that defendant did not, in fact, pay $380 for said land, but, on the contrary, contracted to pay $200; that defendant has at all times concealed the fact of his fraud and deceit aforesaid, and has always continued to represent to plaintiff that said eighty acres of land cost $380, and has prevented plaintiff from discovering the fraud perpetrated upon him; that plaintiff did not discover such fraud and deceit, and did not discover the facts at all until on or about December 23, 1904; that although often requested so to do, defendant has refused to repay plaintiff the sum of $214."

The facts found are fully warranted by the evidence upon this count. The judgment is small, but ought to be affirmed.

V. We shall not go further into the details of subsequent counts and the findings of fact thereon. Suffice it to say that in all of the different deals, save and except the one mentioned in the second count, the same general plan was pursued. Defendant would find, to his mind, a valuable piece of property, and induce the plaintiff to join him in the purchase thereof, sometimes taking a half-interest and at other times a different interest. At all times, the plaintiff seems to have furnished as much or more cash than was necessary to carry the whole deal. At all times the amount put in by plaintiff was the result of the fraud and deceit of the defendant. During all the years of these transactions the plaintiff was blinded to an investigation of the facts by the confidence that he had in defendant purposely induced by the conduct, actions

and representations of defendant. The several findings are based upon the actual cash which plaintiff was induced to part with on account of the fraud and deceit practiced, together with six per cent interest thereon. As stated above the plan of operation being so similar in all counts, except the second, we shall pass to a review of the several positions taken here by defendant, without going into further detail.

VI. It is earnestly insisted that the Statute of Limitations has run upon these claims. This would be true as to at least some of them, but for things disclosed in the record. As stated elsewhere, it is important to consider the whole case together, in order to determine the plan and scheme of defendant's operations. When that is done, it is as clear as a noonday's sun. Nor was the plan one unknown to some real estate transactions. Courts are not blinded as are bats. From this record it appears conclusively that defendant's idea was to cultivate an intimate relationship between himself and the plaintiff, and to use such relationship to his own advancement. Men of means can be induced to enter into business ventures with friends, and this the defendant seems to have fully appreciated. In each instance, save the one, the plaintiff was approached in the spirit of friendship, and a gentle hint given that big money was in sight in a certain deal, and out of friendship plaintiff would be taken in on the deal. It would seem almost incredible that one could be taken in so often, yet when the endearing letters written by defendant are read, the confidence of plaintiff considered, his age and environments considered, it is not beyond some of our own observations. The circumstances detailed in this evidence would strongly tend to show that the real characters of these deals were hid from the plaintiff until a short time before this action was begun. Not only so, but they were purposely and studiously concealed by de-

fendant. Numerous letters in evidence would lend light as to why the continued confidence was held by plaintiff practically up to the end. One cannot purposely hide his fraud and deception for years, and thus plead the Statute of Limitations. Nor can one purposely act (as the record would strongly tend to indicate in this case) so as to allay the suspicions of his opponent, and then say that he ought to have been more diligent in discovering the fraud. The facts in evidence are such as to obviate the running of the statute. In matters of fraud and deceit, the statute does not begin to run until such time as the fraud is discovered.

VII. Another contention of the defendant, and especially as to the first and most important count of the petition, is that the petition does not charge any actionable representations. The point here is that defendant represented to plaintiff that they could purchase these mining claims for so much money, and that they were exceedingly cheap at the price, and a large profit could be made on such purchase. It is then said by the defendant in the brief, "It is well settled that representations as to what will be done in the future and representations as to value of property, though false, are not actionable."

It will not be necessary to discuss the cases cited under this contention. Defendant has overlooked the full scope of the petition. He has also overlooked the real issue in the case and the point of the judgment. As elsewhere stated the several counts of the petition do ask to rescind the contract and offer to place the parties *in statu quo,* yet one prominent feature of each count is that the defendant, by his fraud and deceit in reference to the price to be paid for the several properties and the amounts to be paid by each, was the inducing cause of plaintiff's parting with his money. Not only so, but the evidence shows that the usual

method of payment was for plaintiff to turn over his share of the alleged cost to defendant, and trust defendant to attend to the whole transaction. The record would indicate that such was the theory below —at least, one of the theories below. The judgment is largely based upon this theory. The prayer of count one reads:

"Wherefore, by reason of the premises, plaintiff prays that the contract between plaintiff and defendant as to the ownership of said mining claims be rescinded, annulled and for naught held, and that the plaintiff have and recover from the defendant the sum of $6000, together with interest thereon at the rate of six per cent per annum from the time of such payment of $6000 until repaid to plaintiff, and plaintiff prays for such other and further relief in the premises as in equity and good conscience he may be entitled to receive."

The petition, being one in equity and calling for general relief, is broad enough to uphold a judgment upon this theory of the petition. There is a specific charge that there was fraud and deceit in these regards. There is ample evidence to sustain the charges. The judgment and findings of fact sufficiently conform to this charge and the proof thereon. This to our mind is sufficient, and other allegations may be treated as surplusage.

VIII. It is also urged that the remedy of plaintiff is one at law and not in equity, and further that if the plaintiff was induced to pay more than he should have paid for the properties, by reason of the false statements made by defendant as to the cost thereof, then his remedy was at law to recover from the defendant the difference between what he (the plaintiff) actually paid, and the price for which the property was actually contracted. In this it strikes us that defendant has again overlooked the real issues of

this case. In these several counts the gist of the action is that the plaintiff was induced to enter into an agreement with the defendant to take a certain interest in the property (usually a half interest) and that this agreement (the one between plaintiff and defendant) was superinduced by fraud and deceit in the particulars above described. The charge in the petition does not undertake to attack the contract made by defendant with the party from whom the property was purchased, but only the agreement and contract between plaintiff and defendant by which their respective interests in the property were determined. The evidence shows that the plaintiff left all matters relating to the several purchases to defendant. This was under their own agreement and contract, and has no special relation to the actual contract with the party from whom the property was purchased. Plaintiff could not well attack the contracts with the party from whom the property was purchased, because by the several agreements between plaintiff and the defendant, the defendant was the agent of the plaintiff. This of course is not absolutely conclusive, because there might be a situation where the seller would fraudulently connive with an agent, which might avoid the contract. This situation, whilst indicated by the proof under the first count, is not pressed, and is not the turning point of the judgment below.

The gist of these several counts is fraud and deceit, and money paid out to defendant in consequence thereof, and the prayer of the petition is to recover the money so obtained, with interest thereon. The judgment responds to the petition, its prayer and the proof. It is immaterial how we classify the action. It was tried before the court, without objection, and without the intervention of a jury. So that even if we consider that such an action for fraud and deceit is and should be considered as an action at law, the defendant is in no position to complain. One paying money by reason

of the fraud and deceit of another is entitled to re-cover the amount so lost, together with legal interest thereon from the date of the payment. The circum-stances of this case are different from one where the party purchasing property from another brings a di-rect action against the seller for fraud and deceit, and in such action elects to hold to what he receives under the contract, but to sue for the damages arising from the deceit and fraud. In the latter instance we have held that the purchaser may hold what he has and re-cover even for the benefits of the bargain. [Kendrick v. Ryus, 225 Mo. 150.]

In this case, the plaintiff plants himself upon a contract between himself and the defendant, and only asks that he be relieved from his contract with defend-ant, i. e., that he be permitted to return to defendant all that he has received, by reason of their said agree-ments, and receive from the defendant what money he had paid defendant, by reason of the fraud and deceit, together with legal interest. To this we think he is entitled. But for the statement that defendant was putting in an equal share, or a proportionate share of the purchase price, the plaintiff might not have entered into the agreement at all. Certain it is that had all the facts been disclosed he would not have entered into these several agreements. So that on this point we think that defendant has misconceived the full force of the petition. In this petition, the plaintiff is not undertaking to put the seller of the property in statu quo, nor is he asking that the contract of the seller be annulled. He simply charges that he and defend-ant had certain talks and agreements as to how they would purchase the property; that in such defendant misrepresented the facts; that such fraud and deceit induced him to enter into the business relationship with the defendant; that by reason of the fraud and deceit as practiced, he has paid to defendant, for their joint benefit, the several amounts sued for in this action.

Other points are made, but these are the substantial ones. It occurs to us that the plaintiff has been induced to part with his money upon and by reason of the fraud and deceit, for years practiced upon him by defendant. It also appears that plaintiff acted with reasonable promptness after the discovery of such fraud. We are therefore of opinion that the judgment *nisi,* should be affirmed. It is so ordered. All concur.

## ON MOTION FOR REHEARING.

It is argued in the motion for rehearing that we have overlooked those cases applicable to the Statute of Limitations, which in effect hold that one must exercise due diligence in discovering the fraud and if he do not so do the statute runs as against his cause of action. We have no fault to find with these cases nor the doctrine which they announce. The doctrine is sound and the cases in principle right, but the facts do not apply here. In the case at bar a fiduciary relation is shown. Not only so, but the entire record is such as to indicate that for all these years there was a studied effort on the part of the defendant to keep the plaintiff in a state of mind which would disarm him of suspicion, and prevent an investigation of the facts. The evidence indicates that for years the defendant was diligent in his effort to disarm the plaintiff of suspicion, and thereby preclude an investigation. Had the first deal stopped with the fraud therein committed, the doctrine of the cases relied upon by the defendant would have been applicable. But such was not the case. We tried to make it clear in the first opinion, that there was a studied effort ever afterwards to disarm the plaintiff of suspicion, and thus preclude an investigation. We so indicated when in the original opinion we said that all the transactions between the parties must be considered together. From the whole relationship ap-

pears the studied effort to disarm the plaintiff of any suspicion of fraud. One cannot perpetrate a fraud and then for years thereafter use fraudulent means and methods to allay suspicion and then be in the attitude of claiming that the Statute of Limitations has run. To so hold would be to give such a party the advantage of his own wrong. By his own wrong, we do not mean the original wrong of the original fraud and deceit, but the subsequent wrong and further fraud and deceit in thus allaying the suspicions of the party for the purpose of preventing investigation. The record in this case shows a fraudulent scheme which was carried on for some years, each act therein being calculated to obviate an investigation of previous acts. One who wrongs another by fraud and deceit, and then further wrongs him by a later fraud and deceit, intended and calculated to disarm the party of suspicion, and to prevent an investigation, is in no position to charge negligence or laches in not sooner making investigation.

It is also urged that the opinion is based upon an alleged conspiracy between defendant, St. John, and others—and that there is no such charge in the petition. We do say in the opinion that the evidence strongly tends to convict defendant and others. In so saying we were but speaking of the record before us. St. John was not a party and did not speak for himself. What he may have been able to show was not in the case. Why his statement of the case was not in the record upon either side does not clearly appear. True it is that he and others, not parties to the record, cannot be convicted of conspiracy without a day in court. But Parker was in court. The facts are in evidence, and it is no unfair deduction from the evidence before us to say that it tended to show that Parker had used others in the perpetration of his fraud upon plaintiff. We think the motion for rehearing should be overruled.